UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MG, *(an infant) by his parents and natural guardians LG and JG*, LG, and JG, *individually*, <br><br> Plaintiffs, <br><br> CALDWELL-WEST CALDWELL BOARD OF EDUCATION, PEONA DEMELLO, SCOTT KEENA, BARBARA MEGIBOW, ROBERT CERCO, DANIEL GERARDI, JOHN DOE 1-10, *jointly, severally and individually*, JOANNE CALICE <br><br> Defendants. | Civil Action No. 09-1869 (KSH) <br><br><br> **OPINION** |

**KATHARINE S. HAYDEN, U.S.D.J.**

**I. Introduction**

In this action, an autistic child, MG, and his parents, LG and JG, bring suit against the Caldwell-West Caldwell School District and certain of its administrators and staff members for violating MG's rights under the U.S. Constitution and New Jersey Law Against Discrimination, and for engaging in tortious conduct. Now before the Court is defendants' motion for summary judgment.

MG is a special education student who is entitled to a free education under the Individuals with Disabilities Education Act (IDEA). Because the facts of this case—and indeed, the majority of plaintiffs' claims—rest heavily on MG's rights under the IDEA, an examination of pertinent provisions of the statute is in order.

**II. The IDEA**

Under the IDEA, states may receive federal education funding if they offer a free and appropriate public education ("FAPE") to all children with disabilities living within their

borders.  20 U.S.C. § 1412(a)(1).  The education a state provides must be "specially . . . designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 556 (3d Cir. 2010) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 3042, 73 L.Ed.2d 690 (1982)).  "Although a state is not required to supply an education to a handicapped child that maximizes the child's potential, it must confer an education providing 'significant learning' and 'meaningful benefit' to the child."  *Id.* (quoting *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999)).

The centerpiece of the IDEA is the Individualized Education Plan ("IEP"), which sets forth an individualized instruction program for each special education student.  20 U.S.C. §§ 1412(a)(4), 1414(d).  "An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services."  *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 589 (3d Cir. 2000) (citing 20 U.S.C. § 1401(a)(20)).  An IEP is created by a "team consisting of the student's parents and teachers, a curriculum specialist from the local school district, and, if requested, a person with special knowledge or expertise regarding the student must develop an IEP."  *Bayonne Bd. of Educ.*, 602 F.3d at 557 (citing 20 U.S.C. § 1414(d)(1)(B)).  An IEP team is required to meet annually at a minimum to examine a child's progress and evolving needs.  20 U.S.C. § 1414(d)(4).

"Though the IEP must provide the student with a 'basic floor of opportunity,' it need not necessarily provide 'the optimal level of services' that parents might desire for their child."  *Bayonne Bd. of Educ.*, 602 F.3d at 557 (quoting *Holmes*, 205 F.3d at 590).  "At a minimum, the IEP must be reasonably calculated to enable the child to receive meaningful educational benefits

2

in light of the student's intellectual potential." *Id.* (quoting *Chambers v. Phila. Bd. of Educ.*, 587 F.3d 176, 182 (3d Cir. 2009)) (internal quotations and alterations omitted).

Parents may challenge an IEP in an administrative proceeding if they feel it does not provide their child with a FAPE. 20 U.S.C. § 1415(b)(6). If the parents and the school district fail to successfully mediate their dispute, the matter proceeds to a due process hearing before an ALJ. *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004) (citing N.J.A.C. § 6A:14-2.7). "A party to the due process hearing aggrieved by its outcome has the right to bring a civil action challenging the decision in any state court of competent jurisdiction or in a federal district court, without regard to the amount in controversy." *Bayonne Bd. of Educ.*, 602 F.3d at 558 (citing 20 U.S.C. § 1415(i)(2)).

## III. Facts

### A. The Parties

MG, a child born on February 5, 2001, has been diagnosed with Autism Spectrum Disorder with possible Aspergers Disorder and Attention Deficit Hyperactivity Disorder. (Second Amended Complaint ("SAC") ¶ 4.) In 2004, MG began attending the Harrison School in the Caldwell-West Caldwell public school district ("the district"); he was placed in a self-contained preschool disabled program. (*Id.* ¶ 10.) Just before the start of the 2007–2008 school year, MG was placed in the Wilson Elementary School in West Caldwell. Again, he was placed in a self-contained classroom where a special education teacher taught him alongside other special education students. (JG Dep. 20:14–24.) While at the Wilson school, he also received speech and occupational therapy and had an all-day one-on-one aide. (*Id.* 20:14–24, 21:22–22:1.)

The defendants are the Caldwell-West Caldwell Board of Education, which operates the school district and, accordingly, the Harrison and Wilson schools (SAC ¶ 5), and certain school district administrators and staff members.  Peona DeMello was MG's teacher at the Wilson school during the 2007–2008 school year, and Scott Keena is the principal of the Wilson school. (*Id.* ¶¶ 17, 19, 20.)  JoAnn Calice worked for the district as a case manager and school social worker, and she served as MG's case manager during the 2007–2008 school year until May 2008.  (Calice Dep. 13:17–18, 8:18–20, 7:23–24.)  Barbara Megibow was the Wilson's school's psychologist and became MG's case manager when they removed him from the Wilson school in May 2008.  (SAC ¶ 21; Megibow Dep. 7:24–8:11.)  Dr. Robert Cerco was the district's Director of Special Education during the 2007–2008 school year, and Dr. Daniel Gerardi is the district's Superintendent of Schools.  (SAC ¶¶ 5, 24.)

### B. MG's Diagnosis and Behavioral Background

MG's parents first became aware of the symptoms of MG's autism when he was 3 ½ years old, when his preschool teacher noticed that he avoided eye contact.  (JG Dep. 10:8–9, 11:12–17.)  The behaviors he has exhibited include perseverative behavior with doors (*i.e.*, constantly opening and closing them) and echolalia (*i.e.*, repeating what other people say).  (*Id.* 12:9–24, 17:2–8.)  He has also had issues with pushing, hitting, and biting other children, and his parents testified that his tantrums occur without explanation and that there is no surefire way to resolve them.  (Social Assessment of MG, attached to Harrison Aff. as Ex. L; LG Dep. 12:8–10; JG Dep. 25:1–22.)  When MG was 5 ½ years old, he hit his teacher, Mrs. Collins, and thereafter, his parents met with Collins, the school principal (who at the time was Mr. Ayers), MG's occupational and physical therapists, Dr. Cerco, and MG's case manager, and discussed how to better manage MG's behavior.  (JG Dep. 37:2–39:19, 79:15–80:2.)  After the meeting, Mrs.

Collins drafted a behavior plan, but MG's parents never signed on to it.  (*Id.* 39:22–40:22; Collins/Lijoi Behavior Plans, attached to Harrison Aff. as Ex. K.)  As he approached his sixth birthday, MG's behaviors in school were becoming unmanageable and disruptive. (Communications, attached to Harrison Aff. as Ex. P, Nov. 3, 2006 email of Tim Ayers.)

### C. MG's IEP

In the summer of 2007, the district's child study team met with MG's parents and teacher to develop an IEP.  (IEP, attached to Harrison Aff. as Ex. G.)  MG's IEP included behavioral goals and objectives, as well as goals related to math and reading, all of which were to be implemented by his teacher, DeMello.  (*Id.* at 10–22.)  In addition, the IEP described certain strategies like planned ignoring, positive reinforcement of desired behaviors and reinforcement of appropriate peer behaviors, all of which were designed to encourage positive behavior from MG.  (*Id.* at 5.)  MG had responded well to certain of these strategies.  (Megibow Dep., 59:4–7.) The IEP also included teaching strategies like using short, structured assignments, giving immediate feedback, emphasizing listening and eye contact, and getting MG's attention before giving him assignments.  (IEP at 24.)  The IEP did not, however, include a formalized behavior plan intended to deal with aggressive behaviors because at the time, MG had no ongoing problem with aggressive behaviors.  (*Id.* at 9; Megibow Dep. 65:7–11.)  For the same reasons, the child study team did not conduct a Functional Behavior Analysis ("FBA"), which is employed to examine and help counteract problem behaviors like aggressiveness.

### D. The 2007–2008 School Year

#### *1. The School Discusses MG's Education With His Parents*

DeMello became MG's teacher at the start of the 2007–2008 school year.  (DeMello Dep. 10:14–17.)  During the year, she had 6–8 kindergarten and first grade students in her class.  (*Id.*

11:5–18.)  In September and October of 2007, DeMello and JG discussed behavior techniques

that had previously worked for MG, including a "token" reward system under which MG would

be rewarded with playtime or individual time with DeMello if he cooperated with the lesson plan

for a certain amount of time.  (Communications at DA000541, DA000552, DA000556–558.)

Defendants refer to these behavior techniques as a "behavior plan"; however, plaintiffs assert

that the techniques did not constitute a behavior plan because MG's parents never formally

consented to it and it was not included in MG's IEP.  For purposes of this motion, the Court

considers the techniques not to be a behavior plan.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  Nevertheless, according to communications between DeMello and JG, JG was

satisfied with DeMello's use of the token reward system.  (Communications at DA000561.)

     As the school year progressed, MG exhibited increasingly disruptive behavior, such as

"silly talk," which DeMello described as adding a "Y" or "E" sound to the end of words

DeMello said or rhyming other students' names during lessons.  (DeMello Dep. 47:6–9.)  While

planned ignoring would sometimes cause MG to stop his "silly" behavior, it was occasionally

insufficient, in which case DeMello would seat MG at a desk that was separated from rest of the

students and faced the window.  (Megibow Dep. 45:3–5.)  While plaintiffs characterize this desk

as a "dunce chair," they do not quibble with the location or orientation of the chair, and they do

not cite to any facts in the record equating it to a dunce chair.

     In mid-November, DeMello, and Megibow all discussed via email MG's behaviors and

the continued use of planned ignoring.  On November 7, DeMello planned to meet with Calice

and Megibow regarding a formal behavior plan.  (Communications at DA000595.)  She

informed JG that the meeting would take place on November 12, and after the meeting, she

informed JG of what was discussed, including planned ignoring and creating visual methods for

MG to track his own behavior.  (*Id.* at DA000603–604.)  On November 16, Megibow scheduled

a meeting of MG's parents and the child study team for December 6 to discuss the matter further.

(*Id.* at DA000621.)  Because MG's parents were ill on December 6, they cancelled the meeting,

which was then rescheduled for January 10, 2008.  (*Id.* at DA000646.)  In mid-February, JG, in

an email, stated that she was happy that MG was doing well with the new "choice board," one of

the visual behavior-tracking tools DeMello had introduced for positive reinforcement.  (*Id.* at

DA000697.)

*2. The March 2008 Incidents*

In March 2008, MG's behaviors escalated severely.  On multiple occasions throughout

the month, MG hit, bit, kicked, and pulled the hair of DeMello, his aide, and other students.  He

also ran around the classroom, pulling objects off the walls, turning the lights off and on,

jumping on the window ledges and throwing things.  Furthermore, he ran out of the classroom

and occasionally ran out of the school.  His verbal disruptions of the class escalated, as well; he

screamed in class and repeatedly used silly talk.  MG's increasingly aggressive behaviors are

catalogued in nine incident reports, each of which is described in detail below.

In response to these escalating behaviors, DeMello used two techniques in addition to

planned ignoring and positive reinforcement.  To wit, she separated MG from the rest of the class

when he ran around the classroom, threw things, or otherwise disrupted the class, and she used

restraints when MG tried to hit someone or leave the classroom.  (DeMello Dep. 54:14–19;

42:24–43:3.)  Sometimes when separating MG from the class, DeMello placed him in his

designated chair facing the window.  (*Id.* 67:2–5.)  Other times, she sent him to a room inside the

classroom that was used for speech and small group instruction, and still other times, she sent

him to a small room next to the nurse's office that was used for speech instruction.  (*Id.* 56:10–

7

14.)  Whenever MG was separated from the class, he was always accompanied by either an aide or by DeMello herself.  (*Id.* 56:15–21; Calice Dep. 47:7–8.)  When he was able to return to his assigned task, either DeMello or his aide praised him.  (DeMello Dep. 65:5–9.)

When restraining MG, DeMello initially used the "basket hold," which resembles a "'hug maneuver' from the back."  (Shankar Dep. 35:2–14.)  DeMello claimed to have learned the basket hold from Jason Campbell, a district-contracted occupational therapist, but Campbell asserts that he never instructed anyone on the use of restraints.  (DeMello Dep. 9:3–15, 10:1–5; Campbell Aff., attached to Clemente Certif. as Ex. GG, ¶ 9.)  DeMello noticed that MG often giggled uncontrollably just before she employed the basket hold; Megibow suggested that this meant MG was deriving too much sensory input from the hold and that DeMello should stop using it.  (DeMello Dep. 44:1–9; Communications, March 20, 2008 email from Megibow.)  Megibow suggested another technique, by which either DeMello or an aide would take MG to his seat, place his or her hands on MG's shoulders, explain to MG that he would be expected to remain calm for five seconds, and count to five.  (Communications, March 20, 2008 email from Megibow.)  The shoulder touch was not intended for ongoing use, but rather was used to try to calm MG and give him verbal praise after he calmed down.  (Megibow Dep. 108:17–22.)  This technique achieved mixed results.  (DeMello Dep. 64:24–25.)

### 3. MG's Parents Remove Him from the Wilson School

On March 31, MG's parents sent the school district a letter that revoked their signatures on the IEP; the letter stated that the parents disagreed with MG's "program and place" and requested an IEP meeting.  (LG/JG Letter, attached to Harrison Aff. as Ex. W.)  MG did not return to school after March 26.  (LG Dep. 25:21–22.)  In early April, plaintiffs' non-attorney educational advocate emailed Dr. Cerco to schedule an IEP meeting, which was set for April 8.

(Communications at DA0007; LG Dep. 26:6–7.)  On April 8, the school district agreed to

arrange an out-of-district placement for MG and offered "home instruction" at either the

district's administrative offices or the public library.  MG's parents, however, insisted that home

instruction be conducted at their home.  (JG Dep. 174:13–15; LG Dep. 30:8–16, 30:20–24;

31:13–19.)  Before beginning home instruction, the district wanted to engage a behaviorist to

conduct research and develop a behavior plan for MG, and it enlisted its contracted behaviorist,

Dr. Deborah Paone, to conduct the assessment at MG's home on May 16.  (Addendum to Home

Instruction IEP, Communications, April 17, 2008 Letter from Mark Wenczel.)  Due to a conflict,

Dr. Paone had to reschedule for May 29.  (Communications, April 17, 2008 Letter from Mark

Wenczel.)  According to plaintiffs, the school refused to allow a behaviorist other than Paone to

conduct the assessment, leaving MG out of school from the end of March until the end of May.

(Pls.' Statement of Material Facts ¶ 223.)  On May 23, pursuant to an agreement between the

parties, MG began attending Mt. Pleasant School in Livingston, which is operated by Bergen

County Special Services.  (Letter from Counsel for MG's Family, attached to Harrison Aff. as

Ex. Y, at 4.)  The day before, MG's parents withdrew their consent for the district to conduct an

FBA, asserting that MG's placement at Mt. Pleasant School rendered the point of conducting the

FBA moot.  (*Id.*)

Jackie Dubil-Craig, a behavior specialist, drafted a behavior plan for MG shortly after he

began attending Mt. Pleasant.  (Mt. Pleasant Behavior Plan, attached to Harrison Aff. as Ex. K,

P-7 at 1.)  She indentified his targeted behaviors as aggression—throwing objects, hitting, and

biting—and non-compliance—verbal refusals, running away, and turning off the lights.  (*Id.*)

She recommended that MG's desk be kept at least six feet away from the other students' and that

a reward system be used to reinforce positive behaviors.  (*Id.* at 2–3.)  Dubil-Craig also

suggested that MG be brought to a work area on the other side of the room if his behavior disrupted the class.  (*Id.* at 3.)  In July 2008, MG began attending Washington South, another school run by Bergen County Special Services.  (JG Dep. 179:23–25.)

### E. Procedural History

MG's parents never filed a request for a due process hearing and never sought compensatory education for the time in the 2007–2008 school year during which his education was allegedly inadequate.  (Defs.' Statement of Undisputed Material Facts ¶ 3.)  Nevertheless, they filed an action in New Jersey state court against the above-named defendants, which was removed to this Court on April 21, 2009.  [D.E. 1-2.]  Plaintiffs subsequently amended their complaint twice; the later of the amendments was filed on March 11, 2010, and asserted federal claims under 42 U.S.C. § 1983 for violations of MG's rights under the Fourth Amendment, substantive due process clause of the Fourteenth Amendment, equal protection clause of the Fourteenth Amendment, the IDEA, and the Rehabilitation Act.  [D.E. 5, 10.]  In addition, plaintiffs asserted claims under the New Jersey Law Against Discrimination, the New Jersey Tort Claims Act, and the New Jersey common law of negligence.  [D.E. 10.]  Following discovery, defendants moved for summary judgment on all of plaintiffs' claims.  [D.E. 21.]

## IV. Plaintiffs' Independent Federal Claims

Plaintiffs appear to disavow any direct claim under the IDEA or the Rehabilitation Act. However, plaintiffs' allegations of unlawful conduct are predicated on the school district's alleged failure to comply with those statutes, and the complaint can be read to assert claims under both statutes.  As such, this opinion analyzes both statutes.

**A. IDEA Claim**

Defendants argue that for two separate reasons, plaintiffs' claims, to the extent they are brought directly under the IDEA, cannot survive summary judgment.  First, they contend that "there exists no right to bring an action for damages under the IDEA itself."  (Moving Br. at 27.)  Second, they contend that plaintiffs are required to exhaust their administrative remedies before bringing an action in federal court and that they have failed to do so.  (*Id.*)  Plaintiffs respond that they are not asserting a claim under IDEA for damages (because they do not need to), and that they are excused from exhausting their administrative remedies.  (Opp'n Br. at 1, 23–26.)

First, defendants assert, correctly, that an action for compensatory and punitive damages is not cognizable under the IDEA.  *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 185–86 (3d Cir. 2009).  Count Three of the complaint states that the plaintiffs "demand judgment against the Defendants, jointly, severally and individually for compensatory damages, punitive damages, together with interest, costs and suit and any all further relief which this Court may deem just and equitable."  (Compl. Count 3.)  The IDEA does not countenance such relief.

Second, defendants contend that plaintiffs failed to exhaust their administrative remedies.  The IDEA provides all handicapped children with a FAPE.  20 U.S.C. § 1412.  To protect the children's rights, the statute sets out "an elaborate procedural mechanism," which includes "the right to a due process hearing before an administrative official."  *Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir. 1994); 20 U.S.C. § 1415(f).  A party aggrieved by an administrative determination may bring an action in either federal or state court.  20 U.S.C. § 1415(i).  Congress intended that before resorting to federal court, plaintiffs must complete the administrative process because allowing a "claim without requiring exhaustion . . . would not only 'render superfluous most of the detailed procedural protections outlined in the statute, but,

11

more important, it would also run counter to Congress' view that the needs of handicapped children are best accommodated by having the parents and the local education agency work together to formulate an individualized plan for each handicapped child's education.'" *Komninos*, 13 F.3d at 778 (quoting *Smith v. Robinson*, 468 992, 1011–12 (1984)).  In addition, exhaustion "allows the education agencies to apply their expertise and correct their own mistakes."  *Woodruff v. Hamilton Twp. Pub. Sch.*, 305 F. App'x 833, 837 (3d Cir. 2009) (citing *McKart v. United States*, 395 U.S. 185, 194–95 (1969)).

The Third Circuit does, however, recognize four exceptions to the exhaustion requirement.  *Id.*  These are (1) where exhaustion would be futile or inadequate, (2) where the issue presented is purely a legal question, (3) where the administrative agency cannot grant relief, or (4) where exhaustion would work a severe or irreparable harm on a litigant.  *Id.* Plaintiffs assert that in this case, exhaustion would be futile or inadequate and that an administrative agency could not grant relief.  They argue that the administrative process would only have determined whether MG's current placement is appropriate, which would be futile because MG has been placed in a school where he appears to be succeeding.  (Opp'n Br. at 25.) They also contend that they allege systemic problems in the Caldwell-West Caldwell school district that the administrative process would not address.  (*Id.*)

Plaintiffs provide no support for their assertion that in an administrative hearing, "the purpose of the exercise is to determine predominantly whether the placement is appropriate." (*Id.*)  On the contrary, under New Jersey regulations, "a due process hearing may be requested when there is a disagreement regarding identification, evaluation, reevaluation, classification, educational placement, the provision of a free, appropriate public education, or disciplinary action."  N.J.A.C. § 6A:14-2.7(a).  In addition to placement, the remedies available under the

IDEA include, among others, reimbursement for "out-of-pocket expenses that the school district 'should have paid all along and would have borne in the first instance had it developed a proper IEP,'" *Chambers*, 587 F.3d at 184, and compensatory education "for the period during which [the child] was denied appropriate services," *Lester H. v. Gilhool*, 916 F.2d 865, 868, 873 (3d Cir.1990).

Moreover, in discussing the futility exception the Third Circuit has focused on instances where plaintiffs "allege systemic legal deficiencies and, correspondingly, request system-wide relief that cannot be provided (or even addressed) through the administrative process." *Beth V. by Yvonne V. v. Carroll*, 87 F.3d 80, 89 (3d Cir. 1996). In *Carroll*, the plaintiffs complained that the state department of education simply ignored their numerous requests for due process hearings and other relief. *Id.* at 83. Plaintiffs quote *Grieco v. N.J. Dep't of Educ.*, which stated that "a claim is 'systemic' if it implicates the integrity or reliability of the IDEA dispute resolution procedures themselves, or requires restructuring the education system itself in order to comply with the dictates of the Act." 2007 WL 1876498, at *6 (D.N.J. June 27, 2007) (citation and quotation marks omitted). However, plaintiffs omit the second half of the quote, which clarifies that a claim "is not 'systemic' if it involves only a substantive claim having to do with limited components of a program, and if the administrative process is capable of correcting the problem." *Id.* Indeed, *Grieco* instructs that to demonstrate the existence of systemwide failures, "plaintiffs must show that the [administrative agency's] policies are contrary to law, and that the underlying purpose of exhaustion would not be serviced by requiring procedural compliance." *Id.* (quoting *Ellenberg v. N.M. Military Inst.*, 478 F.3d 1262, 1277 (10th Cir.2007)). In other words, plaintiffs must show that New Jersey's administrative process operates in a manner that is contrary to IDEA requirements. Merely showing that their child's education program was

13

inadequate is not enough, as properly functioning administrative procedures can remedy such a problem.

In this case, MG had an IEP for the 2007–2008 school year.  (Defs.' Ex. G.)  Plaintiffs contend that when MG developed increasingly problematic behaviors, his teachers and the school administrators should have "immediately assembl[ed] the IEP team, conduct[ed] a functional behavioral assessment (FBA) of the student's problem behaviors, develop[ed] measurable goals addressing the problem behaviors, and develop[ed] a behavior intervention plan (BIP) that would include proper techniques, strategies and nonaversive action." (Opp'n Br. at 23.)  In essence, plaintiffs assert that the school district failed to provide MG with a free, appropriate public education.  They have presented facts suggesting that MG's educational plan was inadequate in reference to the IDEA's mandates, but they have not presented facts suggesting that the state of New Jersey's administrative procedures could not resolve the shortcomings of MG's education.  Plaintiffs claim is exactly the kind of claim that is intended to be resolved by the administrative process, and a claim for which administrative hearing officers are obligated to provide relief if it is warranted.  20 U.S.C. § 1415(f)(3)(e)(i) ("[A] decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education."); N.J.A.C. § 6A:14-2.7(a).

In sum, because plaintiffs have failed to exhaust their administrative remedies, summary judgment is warranted to the extent plaintiffs' claim is viewed as arising directly under the IDEA.  *See W.B. v. Matula*, 67 F.3d 484, 493 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007).  In addition, because plaintiffs seek compensatory and punitive damages, any IDEA claim they have is not cognizable.

14

### B. Rehabilitation Act Claim

Defendants contend that "[a]dministrative exhaustion is also required for claims under the Rehabilitation Act." (Moving Br. at 29.) They cite 20 U.S.C. § 1415(*l*), which states

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under . . . title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 791 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

"This provision bars plaintiffs from circumventing IDEA's exhaustion requirement by taking claims that could have been brought under IDEA and repackaging them as claims under some other statute—e.g., section 1983, section 504 of the Rehabilitation Act, or the ADA." *Jeremy H. by Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 281 (3d Cir. 1996). To the extent that plaintiffs bring a claim under the Rehabilitation Act, it recapitulates their IDEA claim and exhaustion is therefore required. Plaintiffs have not exhausted their administrative remedies, so summary judgment is warranted to the extent plaintiffs' claim is viewed as arising under the Rehabilitation Act.

## V. Plaintiffs' Section 1983 Claims

### A. Based on Violations of IDEA and the Rehabilitation Act

Plaintiffs seek relief under § 1983 on the grounds that defendants "deprived MG of his right to free appropriate public education," a right guaranteed to him by the IDEA. (Opp'n Br. at 40.) Specifically, plaintiffs assert that defendants "failed to conduct an Individualized Education Program ("IEP") Team meeting with MG's parents, and failed to implement a specific behavior plan to address MG's inappropriate behaviors, even after JG's persistence that a behavior plain [sic] is needed to address MG's inappropriate behavior." (*Id.*) In so arguing, plaintiffs invoke

various IDEA provisions.  However, the Third Circuit stated very clearly in *A.W. v. Jersey City Pub. Sch.* that "a § 1983 action is not available to remedy violations of IDEA-created rights." 486 F.3d 791, 802 (3d Cir. 2007).  In the course of arguing that they should be excused from having to exhaust administrative remedies, plaintiffs state in no uncertain terms that they are hinging their § 1983 claims on violations of the IDEA:  "The focus of this case is not on IDEA and the remedies available under IDEA; rather the reference to IDEA concepts help set the context for the tort claims and § 1983 claims."  (Opp'n Br. at 25.)  By using terms like "IDEA concepts" and "context," plaintiffs essentially concede the point that they are seeking to vindicate IDEA-created rights.  Such a tactic is barred by *Jersey City*.

Plaintiffs also assert a § 1983 claim on the grounds that defendants violated the Rehabilitation Act.  (Compl. Count 3, ¶ 2.)  Just as plaintiffs may not rest their § 1983 claims on an IDEA violation, they may not rest them on a violation of the Rehabilitation Act.  *See Jersey City*, 486 F.3d at 805–06 ("[W]e conclude that § 1983 is not available to provide a remedy for defendants' alleged violations of A.W.'s rights under Section 504.").

As the Third Circuit stated in *Jersey City*, "when a private, judicial remedy is available for alleged statutory violations, this remedy is intended to be exclusive."  *Id.* at 805.  Therefore, plaintiffs cannot pursue a § 1983 damages action to remedy the alleged violations of the IDEA and Rehabilitation Act; they must seek relief directly under those statutes instead.  Defendants are therefore entitled to summary judgment on plaintiffs' § 1983 claims that invoke the IDEA and Rehabilitation Act.

### B. Based on Violations of Fourth Amendment and Substantive Due Process Clause

Plaintiffs also seek relief under § 1983 for purported violations of MG's Fourth Amendment right to be free from unreasonable searches and seizures and his Fourteenth

Amendment right to substantive due process.  (Opp'n Br. at 34–36.)  They describe the conduct underlying their Fourth Amendment claim as follows:

> In the instant case, Defendant Peona DeMello, MG's teacher and a government actor, without any training or the authority of MG's parents, used physical restraint techniques on MG, such as the basket hold and the papoose hold.  The basket hold and the papoose hold required DeMello, an adult, to use excessive force to push down MG's shoulders and arms and therefore, restraining his ability to move his limbs and body.

(*Id.* at 34–35.)  They describe the conduct underlying their substantive due process claim thus:

> [D]efendants DeMello and Keena, without any training or authority from MG's parents, utilized the basket hold and papoose hold in which they pushed down on MG's shoulders and arms for several minutes thereby restricting his ability to move and immobilized in a bear hug on numerous occasions.  MG was physically restrained on almost a daily basis for two to three weeks simply because MG exhibited unruly and disruptive behaviors.

(*Id.* at 36.)

"It is black-letter law that 'if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'" *Hough v. Shakopee Pub. Sch.*, 608 F. Supp. 2d 1087, 1113 (D. Minn. 2009) (citing *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)).  However, the Third Circuit has held that the Fourteenth Amendment substantive due process clause's "shocks the conscience" standard applies "to federal claims alleging the use of excessive force by public school officials." *Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 172 (3d Cir. 2001).  Thus, while the language excerpted above demonstrates that plaintiffs' claims for violations of the Fourth Amendment and substantive due process are based on the same conduct, because the conduct alleged is DeMello's use of excessive force, the Court will apply the shocks the conscience standard.

The substantive due process clause of the Fourteenth Amendment "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Id.* (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)).  Thus, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)).  In *Gottlieb*, the Third Circuit demarcated the four elements of the shocks the conscience standard:

> [1] Was there a pedagogical justification for the use of force?; [2] Was the force utilized excessive to meet the legitimate objective in this situation?; [3] Was the force applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and [4] Was there a serious injury?

*Id.* at 173.  In examining these factors and the proofs at hand, the Court concludes that no reasonable jury could find that the restraints used on MG shock the conscience.

Under the first factor, maintaining an environment that is conducive to learning is a legitimate pedagogical justification.  *Woodard v. Los Fresnos Indep. Sch. Dist.*, 732 F.2d 1243, 1246 (5th Cir. 1984) ("Corporal punishment is a deprivation of substantive due process when it is arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning.")  In *Gottlieb*, the court determined that this factor favored the plaintiff where the school official offered no justification for using force and the student was "standing obediently" in the official's doorway.  272 F.3d at 174.  The court noted that "At the very least, the force must be capable of being construed as an attempt to serve pedagogical objectives.  *Id.*

In this case, DeMello had an appropriate pedagogical reason for using force to restrain MG.  As indicated in the incident reports, MG repeatedly hit, bit, kicked, and pulled the hair of

his teachers, aides, and fellow students.  On March 10, MG tried to bite DeMello, pulled his

aide's hair, hit both DeMello and the aide, kicked DeMello, and knocked DeMello's glasses off

her face.  (Incident Report for 3/10/08, attached to Clemente Certif. as Ex. II.)  The next day, he

tried to bite both his morning and afternoon aides, and he ran around the room pulling things off

the walls and jumping on the window ledges.  (Incident Report for 3/11/08, attached to Clemente

Certif. as Ex. II.)  On March 13, he again tried to bite DeMello, and he ran out of the classroom.

(Incident Report for 3/13/08, attached to Clemente Certif. as Ex. II.)  On March 18, he hit

DeMello in the face twice and again ran around the classroom.  (Incident Report for 3/18/08,

attached to Clemente Certif. as Ex. II.)  The day after that, he threw things off his desk and

DeMello's desk.  (Incident Report for 3/19/08, attached to Clemente Certif. as Ex. II.)  On March

20, he ran out of the building four times and hit both his aide and DeMello.  (Incident Report for

3/20/08, attached to Clemente Certif. as Ex. II.)  On March 24, he pulled an aide's hair and hit

and kicked another student.  (Incident Report for 3/24/08, attached to Clemente Certif. as Ex. II.)

The next day, he hit DeMello again (Incident Report for 3/25/08, attached to Clemente Certif. as

Ex. II), and the day after that, he ran around the room and disrupted the class, and then kicked

DeMello and an aide (Incident Report for 3/26/08, attached to Clemente Certif. as Ex. II.)  In

response to such escalating behaviors, DeMello's actions were tied to a legitimate pedagogical

interest in maintaining an atmosphere that was conducive to learning.

The second factor is whether the force used was excessive.  In *Golden ex rel. Balch v.

Anders*, an Eighth Circuit case, a teacher restrained a student a sixth-grade student who was

kicking a vending machine.  324 F.3d 652 (8th Cir. 2003).  The student grabbed the teacher for

balance, and shortly thereafter, the school principal arrived on the scene.  *Id.*  Seeing the student

in an agitated state and with his hands on the teacher, the principal grabbed the student by the

collar, brought him outside, and physically held him down on a bench.  *Id.*  The court held that

the force used by the principal was not excessive in light of the fact that the student was difficult

to control and presented a danger to himself and others.  *Id.* at 654–55.  The situation is similar

here.  DeMello never used any physical restraints on MG, nor did she ever hit or spank MG.

Rather, she held him in a bear hug and put her hands on his shoulders.  Because MG repeatedly

endangered himself and other students by running around the room and hitting and biting, the

force DeMello used was no greater than necessary.

Under the third factor, the force DeMello used was applied in a good faith effort to

maintain discipline and not to intentionally harm MG.  DeMello restrained MG in order to

prevent him from harming himself and other students.  Plaintiffs suggest that because MG is

autistic and sensitive to touching, DeMello knew that restraining MG would cause him harm.

(Opp'n Br. at 36.)  They buttress their argument by stressing that MG now suffers from post-

traumatic stress disorder.  However, the fact that DeMello stopped using the basket hold when

she realized it provided too much sensory input to MG indicates that she never intended to harm

him.  In *Metzger v. Osbeck*, the Third Circuit stated that the fact that the teacher using excessive

force knew the consequences of his actions could establish intent to harm a student.  841 F.2d

518, 521 (3d Cir. 1988).  *Gottlieb*, however, in finding a lack of intent, distinguished *Metzger*,

noting that the teacher in *Metzger* used a chokehold, as opposed to a slight push such as that at

issue in *Gottlieb*.  *Gottlieb*, 273 F.3d at 175.  Here, DeMello hugged MG and touched his

shoulders.  As in *Gottlieb*, the minimal force used and the justification for the force used

demonstrate that DeMello did not intend to harm MG.

Finally, while plaintiffs assert that MG currently suffers from post-traumatic stress

disorder, the Court concludes that, as a matter of law, DeMello's conduct on the whole does not

20

shock the conscience.  In *Gottlieb*, the court stated that "[defendant's] placing his hand on a student's shoulders and moving her mere inches is not 'a brutal and inhumane abuse of official power literally shocking to the conscience.'"  *Id.*  Likewise, in this case, no reasonable jury could find that DeMello's actions rise to a constitutional violation.  Defendants are therefore entitled to summary judgment on plaintiffs' Fourth Amendment/substantive due process claim.

### C. Based on Violation of Equal Protection Clause

Plaintiffs also assert a claim under § 1983 for a violation of the equal protection clause of the Fourteenth Amendment.  They contend that while defendants used similar physical restraints on both MG and another student in DeMello's class who exhibited aggressive behaviors, defendants had permission from the other student's parents to use restraints, but did not have permission from MG's parents.  (Opp'n Br. at 39.)  On this basis, plaintiffs contend that defendants treated MG differently from the other student and thereby violated MG's right to equal protection.

In *Chambers*, the Third Circuit reiterated the standard for establishing an equal protection violation:

> The Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "This is essentially a direction that all persons similarly situated should be treated alike."  *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir.2005) (citation omitted).  "To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination."  *Andrews*, 895 F.2d at 1478 (citation omitted).  "They must demonstrate that they received different treatment from that received by other individuals similarly situated."  *Id.* (internal quotation marks and citation omitted).

*Chambers*, 587 F.3d at 196.  A plaintiff must establish that "a classification was adopted 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group."  *Stehney v. Perry*, 101 F.3d 925, 937–938 (3d Cir. 1996).

21

Because disability is not a suspect classification, a government policy treating disabled persons differently from non-disabled persons is subject to rational-basis review.  *See Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 366–67 (2001).  "Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."  *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993).  The government body employing the classification need not "actually articulate at any time the purpose or rationale supporting its classification.  Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Id.* (internal citations and quotations omitted).

In this case, plaintiffs assert that defendants adopted a policy of physically restraining and/or isolating MG in the small instruction room and the room next to the nurse's office, and that they did so because MG is autistic.  However, defendants had a legitimate purpose for restraining and/or isolating MG.  As described above, in March 2008, MG's behaviors became increasingly aggressive.  He repeatedly hit, bit, and kicked DeMello, his aide, and other students. He ran around the room pulling objects off the walls, and he ran out of the classroom on several occasions.  All of these incidents are recounted in DeMello's incident reports.  With such escalating behaviors, defendants certainly had a legitimate purpose to prevent MG from hurting himself or other students.  *Wise v. Pea Ridge Sch. Dist.*, 855 F.2d 560, 566 (8th Cir. 1988).  The methods defendants chose to deal with MG's behavior were rationally related to that purpose. DeMello and the aides only restrained or isolated MG when he hit, bit, kicked, or pulled the hair of his teacher, aides, and fellow students, or when he threw things in the classroom, or when he attempted to run out of the classroom or the school.  They never used any mechanical restraints

on MG, and even the isolation techniques did not involve true isolation—whenever MG was placed in the room attached to the classroom or the room next to the nurse's office, he was accompanied by either DeMello or his aide.

Because, viewing the facts in the light most favorable to plaintiff, the record establishes that defendants' policy of restraining and isolating MG was rationally related to the legitimate purpose of protecting MG and others, no equal protection violation occurred. Because no equal protection violation occurred, neither the individual defendants nor the school district can be held liable. *Brown v. Commonwealth of Pa., Dep't of Health Emergency Med. Svcs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003). Therefore, defendants are entitled to summary judgment on plaintiffs' equal protection claim.

## VI. Conclusion

Based on the foregoing, summary judgment is granted to defendants on all of plaintiffs' federal claims. The Court declines to exercise supplemental jurisdiction over plaintiffs' remaining state claims, which are dismissed without prejudice. *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 276 n.2 (3d Cir. 2010). An appropriate order will be entered.

/s/ Katharine S. Hayden

June 30, 2011                                Katharine S. Hayden, U.S.D.J.